HUBBARD v. THOMPSON.[1]

*(Circuit Court, E. D. Missouri.   October 1, 1885.)*

1. CONTRACTS.
    An incomplete contract is not binding.   There must be a definite under-
standing as to all the elements.

2. SAME—SALE OF COPYRIGHT—ACCOUNTING—DAMAGES.
    Where plates, illustrations, and stamps were delivered to A. under an in-
complete contract between him and B. for the sale of the same, together with
a copyright on a book in the manufacture of which they were used, and $4,000
was paid as part consideration, and it was understood that a more definite con-
tract was to be thereafter entered into and reduced to writing, but B. refused
to enter into a more definite contract, or comply with terms of the incomplete
agreement, and proceeded to publish the book, *held*, (1) that there was no as-
signment of the copyright; (2) that B. was entitled to a return of the plates,
etc., upon paying back to A. the $4,000 received, with interest; and (3) that
under the peculiar circumstances of this case B. was not entitled to damages or
an accounting.

In Equity.

Bill for infringement of a copyright on a book entitled "Illustrated
Stock Doctor and Live-stock Encyclopedia," which copyright, to-
gether with stereotype plates, originals of illustrations, and stamps
for binding, are alleged to have been purchased by the complainant,
Hubbard, from the defendant, Thompson, for the sum of $4,000.
The book alleged to infringe said copyright is a book published by
Thompson entitled "The American Farmers' Pictorial Encyclopedia
of Live Stock."   The defendant, Thompson, filed a cross-bill in which
he states that negotiations were entered into between him and Hub-
bard for the sale of said copyright, plates, etc., to Hubbard; that a
partial agreement as to the terms of the sale was made; that said
terms were to be more definitely settled and reduced to writing in
form thereafter; that by the terms of the agreement Thompson re-
served a certain territory for himself, and that Hubbard was to pay
$4,000, and furnish Thompson with books at 10 per cent. above cost;
that the plates, illustrations, and stamps were delivered to Hubbard,
and the $4,000 paid by him to Thompson; and that Hubbard pro-
ceeded to print and publish the book, but refused to enter into a def-
inite written agreement, and refused to furnish books upon the agreed
terms, and that Thompson has suffered great loss and damage in
consequence.   Wherefore, Thompson tenders back the $4,000 paid to
him, and prays that Hubbard be perpetually enjoined from printing,
publishing, or selling the "Illustrated Stock Doctor and Live Stock
Encyclopedia," and for an accounting and damages, and that said
Hubbard be ordered to deliver back to Thompson said plates, illus-
trations, etc.

*Josiah R. Sypher* and *S. M. Breckenridge,* for complainant.

[1] Reported by Benj. F. Rex, Esq., of the St. Louis bar.

*John B. Henderson, Kerr, Gibson & Kerr,* and *C. Q. B. Drummond,* for defendant.

BREWER, J., *(orally.)* This case was argued before my brother TREAT last April, and on the eighth of July he made an order to this effect:

"There is no doubt the defendant's book is an infringement upon the so-called 'Manning Book,' provided, however, the complainant was an assignee of the said Manning book. The *first* question is whether Thompson assigned his copyright so that Hubbard could pursue him for an infringement. The course of dealings between the parties, and what occurred subsequent thereto, leave this proposition in doubt. *Second.* If such assignment was made, whether the same was rescinded. *Third.* Inasmuch as the imprint of plaintiff's publication did not conform to the terms of the statutes, can he maintain an action for an infringement, although the defendant, Thompson, knew that the copyright had been granted? It is deemed that these three propositions, to-wit, the assignment of the copyright, the rescission, and the right to sue for an infringement under the act of June 18, 1874, should be heard before the full bench."

In pursuance of that order those questions were argued last week, and I now state the conclusions to which we have both come after the argument and the examination that has been made. Of course, it would be utterly impossible within proper limits to undertake anything like a review of this mass of testimony. The law governing contracts in the sale of copyrights, in respect to what is necessary to complete a contract, is like the law which obtains in any other case of contract. The minds of the parties must come together upon a definite understanding of all the elements of the contract. If anything remains unsettled, to be determined thereafter, it cannot be said that the contract has been entered into. That is familiar law. Now, the salient facts are these. After some prior correspondence, the defendant, being the owner of this book, and having plates prepared for its publication, on the twenty-seventh of March addressed a letter to the plaintiff containing a proposition of sale. On the thirtieth day of March the plaintiff, who meantime had passed to Hot Springs and returned, met the defendant at the Union depot in this city, and in the hour or two which intervened between the arrival of the Hot Springs, and the departure of the eastern, train they signed a paper. The plaintiff had brought with him two pencil memorandums, one of which was left with defendant, and the other, after some changes, was signed by both parties and taken by the plaintiff eastward. The question is whether the latter paper, thus signed, was understood by the parties to be a definite and closed contract between them, or a mere preliminary statement,—a memorandum of matters upon which they had agreed, and which, with all unsettled details, were thereafter to be put into the form of a complete contract in writing, and then signed and executed. The testimony is not very clear or satisfactory, or, rather, it leaves the matter much in doubt. The paper is a rough, interlined pencil memorandum, entitled "Memoradum of Agreement." That something more was to be done

is evident from the testimony of both parties. The plaintiff's understanding, as he testified, was this:

"The copy I kept and brought to Philadelphia was to be the basis for a more satisfactory draught, to be made with pen and ink in good shape."

The defendant testifies in response to the question:

"Was there any express agreement and understanding as to the purpose for which this pencil memorandum, or either of the pencil memorandums, should be used? *Answer.* That was stated directly, when I objected to signing it as not embodying the contract. He said it will be simply a guide for writing out a contract. He said that was simply a memorandum of some of the features embraced in our understanding, and that it could be used as a guide for writing out a contract embodying the special features agreed upon in our conversation."

Further testimony shows the same divergence, the one testifying that it was to be taken east simply to be put into shape with pen and ink; the other, that it was to be a guide, a sort of a basis, for the preparation of a definite contract between them. On the next day after this pencil memorandum was signed the defendant writes this letter to the plaintiff:

"DEAR SIR: There are so many things not covered in the brief memorandum of our agreement concerning stock-book, and not settled in our brief breakfast conversation Tuesday morning, that I think it best to enumerate some of the points that must be embodied in a more definite contract."

And then he enumerates them. From time to time correspondence passed between these parties. There was a good deal of wrangling and complaint, and occasional reference to the contract which was to be prepared,—this contract to be written in pen and ink,—and on July 22d, several months after, the plaintiff sent out a written contract to the defendant to be signed. That contract left out all reference to the transfer of the copyright of the book and the plates, and simply looked forward from its date, instead of being operative from the thirtieth of March. The defendant, not satisfied with it, on August 2d prepared his idea of the contract in writing, and sent it to Philadelphia, but neither of them were signed.

If this was all, there would be very little doubt that the parties had not come to a definite understanding. What embarrasses the question is the fact that immediately after, or within a short time after, the signing of the pencil memorandum defendant forwarded the plates, etc., and received from the plaintiff the notes—the stipulated price. Of course, the argument on one side is very fairly and strongly made that that shows that the parties understood that this pencil memorandum was the final agreement between them, that there was a definite contract, and that all that was to be done was to reshape it and put it in ink.

On the other hand, the argument is equally forcible and persuasive that the parties supposed the main features of the contract had been agreed upon between the parties, and that they were forwarding the plates, etc., leaving all details and unsettled matters to be settled in

the written contract; this contract to be written with pen and ink, which by the voice of both parties it was understood should be prepared.

Of course my opportunities for examing all this testimony have not been quite as good as my brother TREAT's, who had the benefit of the prior arguments and an intermediate examination; but at the same time I have come to the same conclusion that he has, that there is not in this testimony that which enables the court to say that the parties, in respect to all the items of the proposed agreement between them, ever came to a definite understanding. There were still some matters unsettled,—undetermined,—so that a contract, as it was a single contract, and understood to be a single contract, could not be said to have been finally and definitely consummated. That, of course, ends the controversy so far as the plaintiff is concerned. Defendant has filed a cross-bill, and, as to that, my attention was not called in the argument, yet I will state the conclusion to which we have come, Judge TREAT, both in the prior argument and also from this examination. It seems to us it would be right that the cross-bill should be sustained, so far as the tender is concerned; that is, that upon the payment of so much money, and the interest, the plates will be returned to the defendant; but that, so far as any claim for accounting and damages, the course of dealing between the parties has been such that equitably the defendant is not entitled to any; so that the order will be for the redelivery of the plates, etc., on the payment of $4,000, with interest.

*Mr. Breckinridge.* I understand the decree will be—

*The Court.* Dismissing the plaintiff's bill, and that the plaintiff will return to the defendant the plates and material on payment of the $4,000, and interest.

*Mr. Breckinridge.* Will your honor allow me to say that Mr. Sypher, the senior counsel on the part of the plaintiff, is at present in Philadelphia. I would like to have his aid before your honor enters the decree, and I therefore make the suggestion, if agreeable to the other side, that time be given to draw up the proper form of a decree.

*Treat, J.* You understand the views of the court. They are simply these: That there was no assignment. That ends the plaintiff's case. As to the cross-bill, you are required to pay back the $4,000, with interest; on paying which, the plates, etc., will be returned.

*Mr. Breckinridge.* How about the costs?

*Treat, J.* Each party pays his own costs.